IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

    Plaintiff,

v.                Case No. 13-10090-01-JTM

JOSE G. JIMENEZ,

    Defendant.

MEMORANDUM AND ORDER

  The court has before it defendant Jose Jimenez's Motion to Suppress and for *Franks* Hearing (Dkt. 30). The court held a hearing on September 20, 2013 and is now prepared to rule.

**I. Background**

  Jimenez, whose street name is "Creep" or "Creeper," is charged with five counts of being a felon in possession of a firearm. The affidavit supporting the application for a search warrant provided the following information. At about 3:00 p.m. on May 16, 2013, a shooting occurred between the occupants of a blue Mercury Mountaineer and a white four-door car at 13th and Broadway in Wichita, Kansas. Officers responding to the scene found broken glass and several .223 caliber cartridge casings in the Family Dollar parking lot at that intersection. Within minutes of the shooting, the Mercury Mountaineer was involved in a hit and run accident at 11th and Waco. The Mountaineer contained numerous bullet holes and fresh blood inside the vehicle. By the time the officers responded to the scene, the occupants of the Mountaineer had already

left the scene. The owner of the Mountaineer, Kendra Davis, arrived to inquire about her vehicle. She would not identify the persons who had driven her vehicle or provide any helpful information to the officers. Meanwhile, one police officer discovered surveillance footage shot from 1442 Broadway, which showed a white Ford Focus traveling north on Broadway, then turning east on 14th Street around the time the shooting occurred.

    The next day, Detective Jason Bartel contacted Wanda Edwards, who stated that Kendra Davis had been at her residence at 1542 West 13th Street to do laundry the day before. Kendra was with her boyfriend, Monte Alford, and a second man. Monte and the other man left to get laundry detergent, but they returned a short time later because Monte had been shot in the right shoulder. Wanda told Detective Bartel that Monte kept repeating he was shot by a man named "Nice." Wanda stated that Monte and Kendra had been having trouble with Nice because Nice wanted to date Kendra. Wanda stated that Nice is a black male, twenty to thirty years old, 5'11" tall and about 180 pounds. She also stated that Nice is known to drive a white four-door vehicle.

    On the same day, officers were contacted by F.C., who thought he had seen the suspects involved in the shooting at the Family Dollar. At some time between 2:30 and 3:00 p.m. on May 16, while working at a house at 1449 N. Topeka, F.C. saw two black males in front of 1454 N. Topeka. One carried a shotgun to a small white vehicle parked in front of 1454 N. Topeka. F.C. heard one of the men say "let's go, let's go," and then they both got in the small white car—described by F.C. as possibly being a Ford Focus—and drove off. A few minutes later, F.C. heard three to five gunshots.

2

Also on May 17, officers received an anonymous tip that the suspects involved in the shooting lived in a white house south of 1544 N. Topeka. The officers believed the house at 1540 N. Topeka fit this description and set up surveillance there.

On May 21, at 9:00 a.m., Detective Chad Beard was monitoring the residences at 1540 and 1454 N. Topeka, when he observed a black male of approximately twenty-five to thirty years of age standing in the doorway at 1540 N. Topeka. A maroon Oldsmobile Alero was parked outside. After walking between the car and the house a couple of times, the man got into the car and drove south on Topeka. The driver stopped at 15th Street and reversed the car, going the wrong way on the one-way street. Officer Troy Bussard activated his lights and siren and attempted to stop the Alero, which sped off south on Topeka Street. The Alero stopped in the east alley behind 1446 N. Topeka. Officer Bussard saw the man exit the car, jump a fence and run west towards Topeka Street. A witness told officers that the man had run into the residence at 1454 N. Topeka. The homeowner at 1454 N. Topeka was Sylvester Henry. He allowed the officers in, where they found Robert White hiding in the attic. Henry identified White as "Nice." Inside the Alero, Detective Beard found a loaded sawed-off twelve-gauge shotgun, a plate with cocaine residue on it, a digital scale, and marijuana. Detective Reichenberger searched Henry's residence and found a black handgun and a loaded thirty-round magazine.

Officers interviewed Henry for an hour and a half.[1] According to the warrant affidavit, Henry told officers that Nice and another man named "Creep" were involved in the shooting at 13th and Broadway on May 16. He said that both men were Crip gang members and he had seen them both with hand guns and assault rifles. Henry stated that Creep and his girlfriend, Brittney White, live at 1540 N. Topeka. According to Henry, Brittney drives the white Ford four-door vehicle that was used in the shooting. Henry said that just prior to the shooting, Nice was at his residence with a black AR-15, and Creep arrived in Brittney's vehicle. A short time after Nice and Creep left Henry's house, Henry heard approximately ten gun shots and received a phone call from Nice, who advised him that Brittney and another female were on their way to Henry's residence to pick up the rest of their property and guns. Henry said that Creep contacted him the next day, asking for his help in starting Brittney's car. Henry said the vehicle appeared to be hidden with its tags removed in a garage at 1540 N. Topeka. According to Henry, the car was still locked in the garage on May 19, the last day he saw it.

Also on May 21, Detective Bartel contacted three men at 1559 N. Topeka. Two of the men said that on May 16, they had seen a white Ford Focus speed out of the alley behind 1540 N. Topeka heading south, stop at 1454 N. Topeka (Henry's house) for a few minutes, and then speed off south on Topeka Street. The same two men said that a short time later they heard four to five gunshots and then observed the white Ford Focus

---

[1] An audio recording of the interview was made. Jimenez attached a transcript of the interview to his motion as Exhibit 1.

traveling east on 14th Street. The third man stated that he had then observed the white Ford Focus speeding north in the east alley of Topeka Street. All three men stated that the white Ford Focus belonged to the residents of 1540 N. Topeka and that it was parked behind the residence on May 16.

Based on this information, the officers applied for and received a search warrant for the residence at 1540 N. Topeka. The warrant listed the following items to be seized: firearms, ammunition, photographs, cell phones, and "indicia of occupancy, residency, rental and/or ownership of the premises described herein, including, but not limited to, utility and telephone bills canceled envelopes, rental purchase or lease agreements, and keys." In executing the warrant, the officers found crack cocaine in a knotted plastic baggie. Officers received a second warrant listing additional items to be seized during their search: crack cocaine, U.S. currency associated with the sale of crack cocaine, and "packaging material, scales, paraphernalia, pagers, portable phones, and surveillance equipment used in association with the sale of crack cocaine."

According to the search inventory, in executing the search warrants, officers seized photos, firearms, ammunition, drug paraphernalia, cocaine, latent prints, DNA swabs, a computer, firearm equipment and parts, documents and indicia of residency, and a BB gun.

Defendant Jimenez argues that two statements attributed to Sylvester Henry in the affidavit supporting the warrant application were false. Jimenez also argues that Henry's history, which the affidavit omitted, would have reduced his reliability and veracity to the point that probable cause would not have been established. Jimenez

argues further that Henry himself contradicted several of the statements attributed to him in the affidavit, and that the officer intentionally or recklessly omitted these contradictory statements. Even if the court upholds the warrant, Jimenez argues that several of the seized items should be suppressed as being beyond the scope of the warrants.

**II. Legal Standard – Suppression of Evidence under *Franks***

It violates the Fourth Amendment to omit a material issue from a warrant affidavit, or to "knowingly and intentionally, or with reckless disregard for the truth" include false statements in the warrant affidavit. *Franks v. Delaware*, 438 U.S. 154, 155 (1978). When a defendant questions the veracity of the affidavit supporting a search warrant, he may request an evidentiary hearing, often called a *Franks* hearing. A defendant is entitled to an evidentiary hearing under *Franks* only if he "makes a substantial showing that the affidavit contains intentional or reckless false statements and if the affidavit, purged of its falsities, would not be sufficient to support a finding of probable cause." *United States v. Kennedy*, 131 F.3d 1371, 1376 (10th Cir. 1997) (citing *Franks*, 438 U.S. at 155–56). The standards of deliberate falsehood and reckless disregard set forth in *Franks* apply to material omissions, as well as to affirmative falsehoods. *United States v. McKissick*, 204 F.3d 1282, 1297 (10th Cir. 2000). However, there is a "presumption of validity" with respect to warrant affidavits, which can only be overcome if a defendant alleges and proves "deliberate falsehoods" or "reckless disregard for the truth." *Franks*, 438 U.S. at 171.

To establish a *Franks* violation and suppress the evidence, the defendant must prove by a preponderance of the evidence that officers omitted material information intentionally or with reckless disregard for the truth, or that the affidavit contains intentional or recklessly false statements. *United States v. Tisdale*, 248 F.3d 964, 973 (10th Cir. 2001). If the defendant can meet that burden, the court next examines the affidavit as if the omitted information had been included to determine whether the affidavit would still establish probable cause. *Id.* Probable cause exists when the supporting affidavit sets forth certain facts that would lead a prudent person to believe there is a fair probability that particular evidence of a crime or contraband will be found in a particular place. *United States v. Basham*, 268 F.3d 1199, 1203 (10th Cir. 2001). If the court concludes that the omitted information would not have altered the judge's decision to authorize the search, the fruits of the challenged search need not be suppressed. *United States v. Avery*, 295 F.3d 1158, 1166–67 (10th Cir. 2002). If, however, the omitted information would have altered the judge's decision, then the fruits of the challenged search must be suppressed. *Id.*

**III. Analysis**

*Sylvester Henry's Statement Regarding Jimenez's Address*

Jimenez first argues that two of the statements attributed to Sylvester Henry in the officer's affidavit are false. First, the affidavit states that Henry said "Creep and his girlfriend, whom [Henry] identified as Brittney N. White, live down the street from [Henry] at 1540 N. Topeka . . . ." However, the transcript of Henry's interview reveals that he never gave a street address for the house, and his description of Creep's house

7

does not match the one at 1540 N. Topeka. Henry described Creep's residence has being a white house "two houses north of 15th and Topeka. . . . on the east side [of the street]." This description actually places Creep's residence in the 1600 block of N. Topeka Street. Therefore, this statement is false on its face: Henry did not identify Creep's house as being located at 1540 N. Topeka. The government concedes this point.

At the hearing, however, testimony made clear that this statement, although technically false, was not intended to mislead the magistrate. Before police officers spoke with Henry, they had been monitoring the residence at 1540 N. Topeka for several days, and they knew it was Jimenez's residence. Because of this prior knowledge, Detective Phipps—the detective who interviewed Henry—understood Henry's description of the house as 1540 N. Topeka, even though the residence is two houses *south* of 15th and Topeka, rather than north. Detective Phipps included his own understanding of what Henry's description meant when Phipps related Henry's statements to Detective Bartel. Bartel wrote up the affidavit, attributing the statement to Henry and believing in good faith that the statement was Henry's.

Regardless of whether the statement attributed to Henry was intentionally false or recklessly made, the warrant still presented sufficient facts for a magistrate to find probable cause to search 1540 N. Topeka. Officers had received an anonymous tip that the people who carried out the drive-by shooting lived at 1540 N. Topeka. In investigating this tip, Officer Beard observed a man—later identified as Robert White, or "Nice"—standing in the doorway at 1540 N. Topeka before he got in his maroon

Oldsmobile Alero, sped away from a police car with its sirens and lights activated, parked his car in an alley, jumped a fence, and hid inside Sylvester Henry's house.

The three men who spoke with Detective Bartel on May 21 provided additional justification for searching 1540 N. Topeka. Two of the men said they had seen a white Ford Focus speed out of the alley behind 1540 N. Topeka, stop at 1454 N. Topeka for a few minutes, and then speed off south before they heard several gunshots. The other man said he saw the Ford Focus speeding back north in the east alley of Topeka Street. All three said the Ford Focus belonged to the residents of 1540 N. Topeka and was parked behind that residence on the day of the shooting. The accounts of the three men about the Ford Focus were corroborated by the surveillance footage police had discovered and Wanda Edwards, who said that Nice was known to drive a car matching the description of the Focus. F.C. further corroborated the accounts of the three men by stating he had seen two black men with a shotgun jump into a car matching the description of a white Focus and drive off just before several shots rang out. Even if the affidavit had not contained the statement attributed to Henry regarding the address, it supported probable cause to search 1540 N. Topeka.

*Sylvester Henry's Statements Regarding Jimenez's Gang Affiliation*

Second, the affidavit states that Henry said both Creep and Nice were Crip gang members. Reviewing the transcript of Henry's interview, he stated that "[t]hey're just Crips as far as I knew. I never knew it until recently when he started talking and they started calling each other Crips . . . ." It is apparent that Henry was speaking of both Jimenez and White when he said this. However, Jimenez takes issue with this statement

9

because the Wichita Police gang database shows he is affiliated with the Folk Gangster Disciples rather than the Crips. He argues that since he is in the database as an FGD, the officer knew he was not a Crip and included Henry's statement in the affidavit as a ploy to connect him with Nice. But Henry *did* state his belief that Jimenez and White were Crip gang members, so the statement attributed to him was not false, even if it could have been supplemented with the database info of Jimenez's gang affiliations. Jimenez makes no showing that the Wichita Police Officers who took Henry's statements or Detective Bartel—who wrote and signed the affidavit—actually knew that Jimenez was an FGD, so the argument that the omission was intentional or reckless is not supported.

Because there was probable cause to search 1540 N. Topeka (which is the ultimate question here), Henry's statement about Jimenez's gang affiliation is irrelevant. Even were that not the case, Jimenez's gang affiliation would have been of little or no consequence in the probable cause determination. Jimenez claims that FGDs are a rival gang of the Crips, reasoning that if his true gang affiliation had been included, the judge would have thought it much less likely that he had been traveling with a Crip gang member. This argument fails to recognize that the connection Henry made between Creep and Nice did not rely on their gang affiliations. Henry stated that Nice and Creep stored their guns at his house, drove up to retrieve the guns together, and left in the car together before the shooting. Nice's and Creep's gang affiliations matter little in the face of testimony of the two men's physical presence together.

*Omissions Regarding Sylvester Henry's Background and Inconsistent Statements*

Jimenez argues that the warrant affidavit omitted several statements Henry made during his interview with officers that contradict the statements attributed to him in the affidavit. But as Detective Phipps explained at the hearing, these inconsistencies were due to Henry's initial unwillingness to be altogether forthcoming with information. It is apparent from the transcript of Henry's interview that he feared possible repercussions from Nice for speaking with police. Henry gave his most complete account of what he knew at the end of the interview, and these were the statements attributed to him in the affidavit. The court finds that the omission of Henry's prior inconsistent statements was made in good faith, not to mislead.

Jimenez also argues that the warrant should fail because the affidavit does not contain any evidence of Henry's reliability or veracity. Sylvester Henry has twenty-two prior convictions for crimes of dishonesty and has been admitted to Larned Mental Health facility in the past. The court is not persuaded by this argument for two reasons. First, Henry's statements regarding the white Ford Focus being involved in the shooting were corroborated by security footage and other witnesses, making his general reliability and veracity irrelevant as to those statements. Second, as the court has already found, the affidavit otherwise established probable cause to search 1540 N. Topeka even if Henry's statements were excluded entirely.

**IV. Motion to Suppress**

Jimenez argues that the seizure of latent prints, a computer, a BB gun, and DNA swabs was beyond the scope of the search warrants, so these items must be suppressed. "The Fourth Amendment requires search warrants to 'particularly describe the place to

be searched, and the persons or things to be seized…'" *United States v. Katoa*, 379 F.3d 1203, 1207 (10th Cir. 2006) (quoting the Fourth Amendment). "The particularity requirement ensures that a search is confined in scope to particularly described evidence relating to a specific crime for which there is demonstrated probable cause." *United States v. Leahy*, 47 F.3d 396, 397 (10th Cir. 1995). "When a logical nexus exists between seized but unnamed items and those items listed in the warrant, the unnamed items are admissible." *United States v. Gentry*, 642 F.2d 385, 387 (10th Cir. 1981).

The court holds that the latent prints and DNA swabs taken from the car inside the detached garage were properly seized. The first warrant authorized the seizure of "indicia of occupancy, residency, rental and/or ownership of the premises described herein, including, but not limited to, utility and telephone bills canceled envelopes, rental purchase or lease agreements, and keys." The warrant identified the residence and its detached garage as the places to be searched. The car from which the DNA and prints were extracted was parked in the detached garage. The DNA and latent prints were the best available indicia of occupancy of the vehicle. For these reasons, this evidence was within the scope of the search warrant and is, therefore, admissible at trial.

The court grants Jimenez's motion to suppress the BB gun seized by the government. Both search warrants issued to the officers authorized the seizure of "firearms," but a BB gun does not meet the definition of a firearm under federal law.[2]

---

[2] A firearm is "any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive." *See, e.g.*, 18 U.S.C. § 921 (2006).

Although the government argues that this particular BB gun looks and feels like a firearm, it concedes that the officers who seized it knew it was not a firearm. Indeed, the search warrant inventory receipt signed by Detective Bartel lists a BB gun as seized evidence, indicating that the detective understood at the time of the seizure that it was not a firearm. The court suppresses the BB gun because its seizure was beyond the scope of the search warrant.

Finally, Jimenez seeks suppression of the computer seized in the search warrant execution. The government argues that the computer was within the scope of the second warrant. In executing the first warrant, officers found crack cocaine in a knotted plastic baggie on the top shelf of a closet in the laundry room of the residence. Officers received a second warrant listing additional items to be seized during their search, which included crack cocaine, money associated with the sale of crack cocaine, and "packaging material, scales, paraphernalia, pagers, portable phones, and surveillance equipment used in association with the sale of crack cocaine." The officers found a notebook with "Creeper" written on it, and it was located inside a computer bag. The government asserts that its location created a logical nexus between the notebook and the computer, justifying the seizure of the computer.

The court is not persuaded by this argument. The Fourth Amendment requires that a search warrant be particular enough in order to avoid a general exploratory rummaging through a person's belongings. *United States v. Campos*, 221 F.3d 1143, 1147 (10th Cir. 2000). The logical nexus must exist between the items listed in the warrant and the items seized. *See Gentry*, 642 F.2d at 387. Here, the warrant did not authorize

13

seizing "records" or "documentation" associated with the sale of crack cocaine. *See United States v. Walser*, 275 F.3d 981 (10th Cir. 2001) (involving a warrant that specifically authorized a search for electronic records of drug trafficking). Nor did the warrant authorize seizing a broad category, such as "evidence of drugs and drug-trafficking." Neither the notebook nor the computer fits the description of the specific items listed in the warrant. Essentially, the government argues that because the search warrant listed drug-related evidence and because drug-dealers often record their business transactions on computers, seizing the computer was within the scope of the warrant. But this argument is inconsistent with the Tenth Circuit's guidance. *United States v. Janus Industries*, 48 F.3d 1548, 1553 (10th Cir. 1995) ("As to what is to be taken, nothing is left to the discretion of the officer executing the warrant.").

Even if the name "Creeper" on the notebook were interpreted to have been properly seized as indicia of occupancy of the residence, the government does not argue that the computer had any such identifying marks on it. The physical proximity of the notebook to the computer is an insufficient nexus for seizing the computer. As the defendant pointed out at the hearing, computers are ubiquitous. "The modern development of the personal computer and its ability to store and intermingle a huge array of one's personal papers in a single place increases law enforcement's ability to conduct a wide-ranging search into a person's private affairs, and accordingly makes the particularity requirement that much more important." *United States v. Otero*, 563 F.3d 1127, 1132 (10th Cir. 2009). If, in executing the warrant, police officers became aware of facts establishing probable cause to believe the computer contained drug-

related evidence, they should have applied for another search warrant. For these reasons, the court suppresses the computer.

**IV. Conclusion**

Finding the warrant supported by probable cause regardless of the inclusion of Sylvester Henry's statements, the court upholds the warrants. The court grants Jimenez's motion to suppress to the extent that he seeks suppression of the computer and BB gun seized in the execution of the search warrants; these items were beyond the scope of the warrant. The court denies Jimenez's motion to suppress to the extent that it seeks suppression of the DNA swabs and latent prints seized.

IT IS THEREFORE ORDERED this 24th day of September, 2013, that Jimenez's Motion to Suppress and for *Franks* Hearing (Dkt. 30) is granted in part and denied in part, to the extent set forth above.

s/J. Thomas Marten  
J. THOMAS MARTEN, JUDGE